# UNITED STATES v. LUI LIM.

## No. 892.

District Court, D. Idaho, E. D.

Nov. 3, 1933.

J. A. Carver, U. S. Dist. Atty., and Frank Griffin, Asst. U. S. Dist. Atty., both of Boise, Idaho, for the United States.

Standrod & Standrod, of Pocatello, Idaho, for defendant.

CAVANAH, District Judge.

This is an appeal from an order of the United States Commissioner directing the deportation of Lui Lim from the United States to the Republic of China upon the charge that he is a Chinese person and a laborer within the United States without a certificate of residence, in violation of the Chinese Exclusion Act approved May 5, 1892, § 6, as amended by the Act of November 3, 1893, §§ 1, 2 (8 USCA § 287).

The Treaty between the United States and China concluded November 17, 1880 (22 Stat. 826), gave to the United States the right to regulate, prohibit, and suspend further immigration of Chinese laborers who may come to this country, permit the admission of Chinese subjects as merchants, students, and travelers, and permitted to remain Chinese laborers who were already in the United States. Resident Chinese of this country under the treaty before the passage of the act of Congress restricting immigration of Chinese, are entitled to all the rights and privileges of subjects of the most favored nations with which the United States has treaty relations, and have the right to remain and follow any of the lawful ordinary trades and pursuits of life. In re Quong Woo (C. C.) 13 F. 229. Their right to come and remain depends upon their status at the time of the entry, and a subsequent change in status to a laborer is not a ground for deportation. Lui Hip Chin v. Plummer (C. C. A.) 238 F. 763; Dharandas Tulsidas et al. v. Insular Collector of Customs, 262 U. S. 258, 43 S. Ct. 586, 67 L. Ed. 969.

Under authority granted by the treaty, Congress, on May 6, 1882, enacted the first Chinese Exclusion Act, which put a restriction upon the entering of Chinese laborers, but did not expell those already here. It was not intended by the act to interfere with the commercial relations between the two countries and those who came to engage, in good faith, in mercantile occupations were entitled to land. 8 USCA §§ 263, 265. The act im-

poses upon all, including merchants, certain requirements as a condition to the privilege of thereafter entering this country and one of which is to be identified as so entitled by the Chinese government. This certificate must be visaed by the indorsement of the diplomatic representative of the United States in China or of the consular representative of the United States at the place from which the person is about to depart, and should it appear that the statements contained therein are untrue, such indorsement should be refused. Such certificate is prima facie evidence of the facts set forth therein and shall be produced to the proper authorities of the United States whenever lawfully demanded, and shall be the sole evidence permissible on the part of the person so producing it to establish a right of entry into the United States. Nagle, Commissioner, v. Loi Hoa, 275 U. S. 475, 48 S. Ct. 160, 72 L. Ed. 381.

■■ The Act of May 5, 1892, as amended by the Act of November 3, 1893, changes the prior acts as to the exclusion of Chinese laborers by providing that it shall be the duty of Chinese laborers within the United States who are entitled to remain therein before May 5, 1892, to apply to such officer as the Commissioner General of Immigration may designate within six months after November 3, 1893, for a certificate of residence, and any Chinese laborer found within the United States without such certificate shall be deemed and adjudged to be unlawfully therein and deported unless he shall establish clearly to the satisfaction of a United States judge that by reason of accident, sickness, or other unavoidable cause he has been unable to procure his certificate, and to the satisfaction of the judge by at least one credible witness other than Chinese, that he was a resident of the United States on the 5th of May, 1892, and if, upon the hearing, it shall appear that he is so entitled to a certificate, it shall be granted. Should it appear that he had procured a certificate which has been lost or destroyed, he shall be detained and judgment suspended a reasonable time to enable him to procure the duplicate from the proper officer granting it. 8 USCA § 287; United States v. Chin Sing Quong (D. C.) 224 F. 752. The act discloses that Congress intended to restrict Chinese coming into this country and carefully preserved the rights of all Chinese (whether merchants or laborers) then lawfully in the country to remain here thereafter. Being directed against laborers as a class, the act requires each Chinese laborer to register within a certain time and procure a certificate that he was a resident of the United States at the time of its passage, and to further effectuate this provision the act provides that: "Any Chinese laborer * * * found within the jurisdiction of the United States without such certificate of residence, shall be deemed and adjudged to be unlawfully within the United States," and accordingly deported. "There were in the country at the time Chinese of favored classes, notably merchants, who were not subjected to the requirement of registration. They were permitted to register if they chose, but were not required to do so, and were entitled to remain without registration." Louie Dai v. United States (C. C. A.) 238 F. 68, 72; Lee Kit v. United States, 193 U. S. 517, 24 S. Ct. 517, 48 L. Ed. 772. So if the defendant was in this country before the adoption of the Act of May 6, 1882, and was engaged in the mercantile business with his uncle at the time of the registration period provided for in the Act of May 5, 1892, and he thereafter acquired the status of a laborer, such change of status does not work a forfeiture of his right to remain in the country, as the Act of May 5, 1892, as amended by the Act of November 3, 1893, does not require Chinese merchants to register. In re Chin Ark Wing (D. C.) 115 F. 412; In re Yew Bing Hi (D. C.) 128 F. 319.

■ The policy of the law must be kept in mind when we approach the meaning of the term "merchant," which is defined in the Act of November 3, 1893 (section 2 [8 USCA § 289]), as being "a person engaged in buying and selling merchandise, at a fixed place of business, which business is conducted in his name, and who during the time he claims to be engaged as a merchant, does not engage in the performance of any manual labor, except such as is necessary in the conduct of his business as such merchant." Lee Kan v. United States (C. C. A.) 62 F. 914; Ex parte Chan Hai (D. C.) 11 F.(2d) 667. And we must be careful to distinguish between the status of a merchant and those below that status. He must have a fixed, substantial, and real interest in the mercantile business, though his own name need not necessarily appear in the firm style. He must have in his own right an interest in a real mercantile business. Lee Kit v. United States, supra; Dharandas Tulsidas et al. v. Insular Collector of Customs, 262 U. S. 258, 264, 43 S. Ct. 586, 67 L. Ed. 969.

■ The defendant asserts that he belongs to the exempted class, a merchant, and not a member of an excluded class, as he was the adopted son of a Chinese merchant at the

time of their entry into the United States in 1882, and he and his uncle were merchants at the time of the passage of the Act of May 5, 1892, which does not require merchants to register, and that he had entered the United States prior to the adoption of the Act of May 6, 1882, which does not exclude Chinese, whether laborers or merchants, who came to this country before the expiration of the ninety days after May 6, 1882. Act May 6, 1882, c. 126, § 3, 22 Stat. 58 (8 USCA § 264); In re Shong Toon (D. C.) 21 F. 386. If his contention is supported by the evidence, then, of course, he should not be deported, for an analysis of the treaty and act of Congress would not place him in the excluded class.

What then is the evidence? It is brief. It was about fifty years ago when the defendant with his uncle arrived in the United States, and naturally it would be difficult to have an extended record covering his arrival and conduct over such a long period of time. However, we are advised that he is a Chinese person born in China and came to the United States with his uncle Liu Lee Bow, arriving at the port of San Francisco in January, 1882. They came in the year of K. S. 8, which the evidence shows to be the year 1882, as the evidence shows that at the time the Treaty was concluded on November 17, 1880, Kuangh Su was Emperor of China and the commencement of his reign as given by S. Wells Williams, Professor of Chinese Language and Literature at Yale College, Tonic-Syllabic Dictionaries· of the Chinese Language, and other notable historians, was on January 12, 1875. The Treaty being dated November 17, 1880, by our government, and dated "Kuanghsu Six year," without doubt, fixes the year K. S. 8, two years thereafter as in 1882. The defendant testified that: "I departed from the Empire of China to the United States of America, with my uncle, Louie Bow, during the first moon of the year Kuangh Su 8; that at the time of our departure for the United States from China, the almond trees were in bloom in the district in Southern China where I had lived; that it was in the spring of the said year Kuangh Su 8; that the 'first moon' of the said year, is the first month of said year; that the sea voyage from China to the port of San Francisco in the United States required thirty days, approximately, and from the time of departure from China to the time of arrival at the port of San Francisco, the voyage was continuous and uninterrupted." His uncle immediately upon their arrival engaged in the mercantile business, as he owned and operated a store at Tuskee, Cal., and sold merchandise there for two years, when they left and went to Chico, Cal., where his uncle continued his mercantile business until they came to Boise, Idaho, about 1891, where the mercantile business was continued in a store on Idaho street near the city hall. When they were in California, the defendant lived with and worked for his uncle, and while they were in business in Boise, and for a period of six years, he became a partner in the business with his uncle. The store was then sold to Long Chung Lung, a Chinese merchant in Boise, and the uncle went to Portland, Ore., leaving the defendant in Boise, who went to work in a garden. The defendant was in Boise for about sixteen years, when he went to Portland, where his uncle was, and remained there with him for about fourteen years, and then went to Pocatello, Idaho, where he has been engaged for about twelve years in working in a Chinese garden. When his uncle left for Portland, he gave to him two sheets of paper and advised him to keep them as they were important as relating to his citizenship in this country. These papers were burned in a fire in the garden in 1933. He insists that his uncle adopted him when they were in China and brought him to this country and took entire control of him.

W. T. Brown, a white person and a native of the United States, testified that the defendant and his uncle came to Boise, Idaho, some time between 1891 and 1895, and that he knew them well as he, being in the transfer business, transferred merchandise for the uncle from the station to his store. He remembered the defendant and thought he was between fifteen and nineteen years of age when they came to Boise, and that he did work in the store located on Idaho street near the city hall with the uncle. After remaining in Boise for about six years, the uncle left Boise, as he remembers hauling his baggage for him to the station. He says they carried on quite a mercantile business with Americans and Chinese.

Liue Ah Fu, who registered as required by law, testified that he met the defendant and his uncle in San Francisco over fifty-one years ago, and after he lived in Portland for ten years he came to Boise and found them there; that they were in the mercantile business in Boise for about five years; the uncle then went to Portland and afterwards returned to China.

The inspector who testified for the government says that he met the defendant at a garden near Pocatello in May, 1933, and talked with him several times through an in-

terpreter. He did not have a certificate of residence, but stated to the inspector that when they landed in San Francisco in the year K. S. 8, they were detained by the authorities for three days, who then gave to them a paper pertaining to his right to be in the United States. There were two hearings at which the inspector says he made different statements as to his age, when he arrived in the United States, and as to his parents, although he thought he was about sixty-one years old. But the evidence clearly sustains the conclusion that the defendant came to this country in 1882 when about nine years of age with his uncle, who he says adopted him in China before Congress passed the first Chinese Exclusion Act, and that he and his uncle during the registration period in 1893 were engaged in the mercantile business in Boise, Idaho, which places them in the exempted class. Even if the defendant's uncle did not adopt him in accordance with the laws and customs of China as the government contends he must show, yet the evidence is clear that the defendant and his uncle arrived in the United States in 1882 before Congress had passed the first Chinese Exclusion Act in 1882, which granted to all Chinese subjects already in the United States the right to remain, and the act of 1892, as amended by the act of 1893, did not require Chinese who were merchants to register and obtain a certificate of residence. He and his uncle were then merchants in Boise before the act of 1892 was passed and during the period of registration.

After considering the age of the defendant when he arrived in the United States together with the length of time he has remained, it becomes clear that he is about sixty-one years of age, for the undisputed evidence shows that he was nine years old when he and his uncle landed at San Francisco in January, 1882. He being then lawfully in the United States at the time of the passage of the first Chinese Exclusion Act on May 6, 1882, and before August 6, 1882, the time allowed by the act to Chinese to come to the United States, and the act of 1892, as amended by the act of 1893, his right to remain should be respected and protected; and the question as to whether he was lawfully adopted by his uncle in China before he could claim the status of his uncle as a merchant becomes unnecessary to decide, for the defendant, independent of the status of his uncle, entered this country lawfully and has so remained in the United States.

The political department of the government has by the acts of 1882 and 1892, as amended by the act of 1893, determined upon what conditions Chinese shall be permitted to enter and remain within the United States, and the judicial department cannot express an opinion upon the wisdom or policy of the measures enacted by Congress; and one, therefore, cannot yield to the contention of the government that the court should under the evidence conclude that the defendant is subject to deportation in face of the conditions in the act of Congress that all Chinese subjects who were already in this country at the time of the passage of the act of 1882, and were merchants during the registration period, are permitted to remain. These conditions when applied to the facts in this case carry out the spirit of the treaty and justly grant to the defendant, who was in the United States before any Chinese were excluded from entering or remaining, the right to remain.

It results that the order and judgment of the commissioner is reversed and the defendant discharged.