## CHRYSSIKOS v. COMMISSIONER OF IMMIGRATION, ELLIS ISLAND, NEW YORK, N. Y.

(Circuit Court of Appeals, Second Circuit. October 30, 1924.)

No. 205.

1. **Aliens ⊙=54—Decision of Board of Special Inquiry conclusive if based on some evidence and action of Board was not arbitrary and unfair.**

If Board of Special Inquiry had before it some evidence on which it could base the decision, and its action was not arbitrary and unfair, the court on habeas corpus cannot go into the merits and set the Board's action aside because in court's opinion Board misjudged evidence.

2. **Aliens ⊙=54—Evidence insufficient to warrant finding that alien was not temporary visitor.**

Evidence before Board of Special Inquiry *held* insufficient to warrant finding that alien was immigrant rather than temporary visitor within Immigration Act May 26, 1924, and General Order No. 30, adopted pursuant to section 15.

Appeal from the District Court of the United States for the Southern District of New York.

Application of George J. Chryssikos for writ of habeas corpus in behalf of Athina Tsouris, against the Commissioner of Immigration, Ellis Island, New York, N. Y. Writ dismissed, and relator appeals. Order reversed, and alien permitted to enter under bond.

Francis E. Hamilton, of New York City, for appellant.

William Hayward, U. S. Atty., of New York City, for respondent.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The relator was born in Greece, and arrived at Ellis Island in New York Harbor, on the steamship Providence, on July 22, 1924. She had with her a passport issued to her in Naples, Italy, on June 13, 1924, which was visaed by the American Consul at that place on July 8, 1924. It stated that she was "proceeding to the United States on pleasure."

After a hearing before a Board of Special Inquiry at Ellis Island on July 23, 1924, the relator was denied admission. Two members of the Board voted to exclude her, the third member announcing himself in favor of her admission. believing that she had established her status as a nonimmigrant.

An appeal was taken to the Board of Review at Washington on July 26, 1924, and the decision of the Board of Special Inquiry was affirmed. It was also affirmed by the Secretary of Labor on July 30, 1924.

Thereupon a writ of habeas corpus was sued out, and on the return of the writ and after hearing, the District Judge dismissed the writ and the relator was remanded to the custody of the Commissioner of Immigration at the Port of New York. The District Judge based his action upon the conclusion that the relator had a fair hearing before the Board of Special Inquiry and that the Board had before it some evidence

upon which it could have based its decision. He therefore dismissed the writ and in his opinion relied on the case of Chin Yow v. United States, 208 U. S. 8, 13, 28 S. Ct. 201, 203 (52 L. Ed. 369), where the court said:

" * * * Unless and until it is proved to the satisfaction of the judge that a hearing properly so called was denied, the merits of the case are not open, and, we may add, the denial of a hearing cannot be established by proving that the decision was wrong."

The proceedings before the Board of Special Inquiry on July 23, 1924, were subject to the Immigration Act of May 26, 1924 (43 Stat. 153), and the regulations promulgated thereunder define the term "immigrant" as meaning "any alien departing from any place outside the United States destined for the United States, except (1) a government official, his family, attendants, servants, and employees, (2) an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure. * * * *"

And section 15 of the act provides that "the admission to the United States of an alien excepted from the class of immigrants by clause (2) * * * of section 3 * * * shall be for such time as may be by regulations prescribed."

And under Regulations to Govern Enforcement of the Immigration Act of 1924 is General Order No. 30, June 6, 1924. It reads as follows:

" 'An alien visiting the United States temporarily as a tourist or temporarily for business or pleasure' shall be construed to mean an alien coming to the United States to remain not more than six months."

And General Order No. 30 further provides as follows:

"In cases where an alien is possessed of a document which has been visaed by the consular officer on the basis of a claim that such alien is visiting the United States temporarily as a tourist or temporarily for business or pleasure, or that he seeks to enter for the purpose of transit through the United States, or solely to carry on trade under and in pursuance of a present existing treaty of commerce and navigation, and the officer in charge at the port is not satisfied that the alien is coming for the purpose stated, such officer in charge, as a condition precedent to the admission of the applicant, may exact a bond in the sum of $500, conditioned that the applicant shall depart from the United States within six months, if visiting the United States temporarily as a tourist or temporarily for business or pleasure, or within ten days if in transit through the United States, or that he shall maintain his exempt status if admitted solely to carry on trade under and in pursuance of a present existing treaty of commerce and navigation."

It thus appears that this relator, if she came to the United States as an alien visitor or tourist as she claims, was neither a quota nor a nonquota immigrant nor an immigrant at all, and was not subject to exclusion, but was entitled to be admitted and to remain in the United States not more than six months. And if "the officer in charge at the port" was not "satisfied" that the alien was visiting the United States temporarily as a tourist or for pleasure, he might exact a bond in the sum of $500 conditioned that she should depart within six months; she being possessed of the "document" mentioned in General Order No. 30.

[1] It is, of course, well established that if the Board had before it some evidence upon which it could base the decision it reached and its action has not been arbitrary and unfair, the courts cannot go into the merits and set the Board's action aside because in the court's opinion the Board misjudged the evidence. Lewis v. Frick, 233 U. S. 291, 300, 34 S. Ct. 488, 58 L. Ed. 967; Low Wah Suey v. Backus, 225 U. S. 460, 468, 32 S. Ct. 734, 56 L. Ed. 1165.

It is equally plain that if the Board has acted in an arbitrary and unfair manner, and directly contrary to law, and there is no evidence before it upon which the exclusion can be based, the courts have the right to set the exclusion order aside and order the alien discharged from the custody of the immigration officials. The decision of these officials must find adequate support in the evidence. Kwock Jan Fat v. White, 253 U. S. 454, 458, 40 S. Ct. 566, 64 L. Ed. 1010; Zakonaite v. Wolf, 226 U. S. 272, 274, 33 S. Ct. 31, 57 L. Ed. 218.

It is undoubted that a decision of the immigration officials holding an applicant not of a status entitling him to admission is not to be rejected in habeas corpus unless it resulted from manifest abuse of power and discretion. Tulsidas v. Insular Collector, 262 U. S. 258, 43 S. Ct. 586, 67 L. Ed. 969. But if the record discloses that these officials have exceeded their powers, the alien may demand his release on habeas corpus. Gegiow v. Uhl, 239 U. S. 3, 9, 35 S. Ct. 661, 59 L. Ed. 1493. And if the Board

makes a finding of an essential fact which is unsupported by evidence, the court may intervene by the writ of habeas corpus. Bilokumsky v. Tod, 263 U. S. 149, 153, 44 S. Ct. 54, 68 L. Ed. 221; Zakonaite v. Wolf, 226 U. S. 272, 274, 275, 33 S. Ct. 31, 57 L. Ed. 218.

[2] We have carefully read the testimony given before the Board of Special Inquiry in order that we might be informed whether there was any evidence before the Board which justified the exclusion order. We have failed to find any such evidence.

The evidence shows that the relator is 25 years of age. A month prior to her arrival at Ellis Island she was married at Naples, Italy, and arrived in this country accompanied by her husband, who was also a Greek by birth. This man first came to the United States in 1912, and he established himself in Philadelphia, where he carries on a lunch room. He also maintains in that city a hat cleaning and shoe shining shop. He has $14,000 invested in his business and $3,000 in a bank. He has a Declaration of Intention to become a citizen of the United States, issued to him by the District Court at Philadelphia on December 19, 1923. He knew the relator before he came to the United States, and he left this country in June, 1924, for the purpose of marrying her, and, as he testifies, for the purpose of bringing his wife to the United States "as a temporary visitor."

The following is an excerpt from his testimony before the Board:

"Q. Do you expect your wife to remain with you in the United States? A. I want my wife to stay with me, but she came on a visit to see my store and the United States and then to return.

"Q. What is to prevent her from staying at this time? A. She merely came on a visit."

The wife's testimony was as follows:

"Q. Don't you wish to stay in the United States and make your home with your husband? A. *Of course, I want to stay.* He is my husband.

"Q. Why didn't you apply to the American Consul for papers that would allow you to stay here permanently? A. I told him I was only coming on a visit.

"Q. Were you advised by any one to tell him you were coming on a visit? A. No.

"Q. If you desire to remain here, why did you say you were coming on a visit? A. I am coming on a visit. I will return to Greece and then come back again.

"Q. Is there any reason why you cannot stay with your husband at this time? A. *No, I will be very glad to stay with my husband.*

"Q. Then, why didn't you tell the Consul that you wanted to stay with your husband? A. I do not know."

Thereupon the husband was further questioned and testified as follows:

"Q. When you made the affidavit before leaving the United States, you stated in that, that it was your intention to go to Greece to marry and bring your wife here for a temporary visit of six months. Why did you make that statement in your affidavit at that time? A. Because my wife is not so strong, and I thought if she stayed in the United States she may get consumption, so I wanted her to return.

"Q. Had you not been informed at that time that because of the restricted immigration law, it would be difficult, if not impossible, at this time to bring your wife for a permanent stay? A. No.

"Q. Are you willing and able to furnish a bond that your wife will return to Greece within a specified time, not exceeding six months? A. Yes.

"Q. How long were you in Naples? A. Two months.

"Q. Do you wish the Board to understand that it is your intention to come here and resume your permanent residence here and send your wife back to Greece? A. Yes, she will go to Greece.

"Q. When do you expect her to come back? A. When I become a citizen.

"Q. Have you a return ticket for your wife? A. No.

"Q. Did you pay any money to the steamship company to be returned to you if your wife was admitted to the United States? A. No.

"By Mr. Travis: Q. In the event that your wife likes this country and the climate agrees with her, do you intend to make application to the government authorities for permission for your wife to remain here for a longer period or permanently? A. No, she will return to see her mother."

The only other person examined by the Board was the husband's nephew, who is in partnership with him in the business in Philadelphia, and who came to the United States in 1914. He testified as follows:

"Q. Do you know why he went to Greece? A. He got married and wanted to bring his wife.

"Q. Is he going back to Greece to make his home? A. I do not know. I think his wife is going back within six months.

"Q. If he has a business in the United States, why will he go back to Greece six months? A. Maybe he will take another vacation.

"Q. Is he is the habit of making trips every six months? A. No.

"Q. Why is he likely to do it now? A. He has money to spend.

"Q. Have you anything further to say in support of the application of your uncle and his wife to be admitted to the United States? A. Nothing to say. * * *

"Q. Are you willing to assist in the matter of giving a bond as a guaranty that your uncle's wife will return to Greece within a specified time? A. Yes."

At the argument in this court the italicized portions of the relator's testimony above set forth were relied upon as a justification for the exclusion order, these passages being relied upon to show that the relator intended to remain in the United States. But they show nothing of the kind. Her answer to the question whether she wished to stay in the United States and make her home with her husband, "Of course I want to stay; he is my husband," affords no ground for the inference that she falsified when she said she was "only coming on a visit." And the same is true of her answer, "I will be very glad to stay with my husband." That she wanted to stay was most natural. It was the answer that was to be expected. But there is a great difference between wanting to stay and intending to stay. And proof of a desire to stay is not proof of an intent to stay. Her testimony shows conclusively that she came on a visit. She is uncontradicted, and her testimony is supported by that of her husband and the nephew. It established the fact that she arrived here as a nonimmigrant and that she is entitled to enter the country as a visitor.

The petition for the writ of habeas corpus states that the husband of the relator was at all times and still is ready and willing to furnish the necessary bond, required by law, to insure the prompt return of the said alien at the expiration of her temporary stay.

The order dismissing the writ is reversed, and the alien permitted to enter the United States under a bond of $500.

It is so ordered.